## Case No. 10,456.

### OGDEN et al. v. GILLINGHAM et al.

[1 Baldw. 38.] 1

Circuit Court, E. D. Pennsylvania.   Dec. 7, 1829.

BILLS AND NOTES — WHAT AMOUNTS TO AN ACCEPTANCE—EFFECT OF BANKRUPTCY OF PRINCIPAL ON POWER OF AGENT.

O. W., residing in New York as the agent of T. N., who had gone to England, put into the hands of the defendants in Philadelphia a quantity of tin to be sold. On the 13th of March the defendants, by letter, informed O. W. that they had sold three hundred boxes, net amount 2,569 dollars 72 cents, "for which you can value on us, payable on the 19th instant." On the 15th of the same month O. W. drew the bill in question. It appeared that before the bill was drawn, T. N. had become bankrupt in England. The defendant gave in evidence certain attachments laid on the property of T. N. in his hands. *Held,* that the above letter did amount to an acceptance of the bill drawn in conformity with it. That the bankruptcy of T. N. did not revoke the power of his agent to draw the bill without notice.

[Cited in Howland v. Carson, 15 Pa. St. 455.]

This action is brought to recover the sum of 2,569 dollars 72 cents, the amount of a bill drawn by Thomas Newbold & Co., of New York, on the defendants [Gillingham, Mitchell & Co.] in favour of the plaintiffs [Ogden, Ferguson & Co.] and duly accepted by the defendants. The pleas of non assumpsit and payment, with leave to give the special matter in evidence, especially certain writs of foreign attachment. After the closing of the evidence on both sides, it was agreed to take a verdict for the plaintiff, subject to the opinion of the court on the following points: (1) Whether there was an acceptance of the bill. (2) Whether the bankruptcy of Thomas Newbold took away the authority of his agent to draw the bill. The bill was drawn by one Oliver D. Ward, residing in New York, the attorney of Thomas Newbold, who had left the United States. Ward, acting as the attorney of Newbold, had put into the hands of the defendants a quantity of tin, with directions to sell it. The defendants afterwards wrote to T. Newbold & Co. at New York, that they had sold three hundred boxes of the tin, net amount 2,569 dollars 72 cents. "for which you can value on us, payable on the 19th instant." This letter was dated 13th March, 1828. On the 15th Ward drew the bill in question, payable on the 19th to the plaintiffs, in conformity with the letter of the defendants. The defendants gave in evidence cer-

1 [Reported by Hon. Henry Baldwin, Circuit Justice.]

tain attachments issued from the district court of the county of Philadelphia. Other facts were given in evidence. which will appear in the arguments of the counsel and opinion of the court.

Mr. Binney, for plaintiff.

The points reserved are: (1) Whether the letter of the 13th of March, 1828. amounted to an acceptance of the bill. (2), Whether the bankruptcy of Thomas Newbold took away the authority of his agent to draw the bill.

1. The letter states that the bill may be drawn payable on the 19th of March; the sum is precisely mentioned, and the bill conforms to the letter in both particulars. The bill was taken by the plaintiff, as so much cash, for the discharge of a debt actually due to them. Coolidge v. Payson, 2 Wheat. [15 U. S.] 66, decides the case in every particular. Johnson v. Collings, 1 East, 98, is relied upon by the defendants; but in that case the promise to accept was not shown to the person taking the bill, but was a mere promise from a debtor to his creditor. Lord Kenyon goes the whole length of saying, that a promise to accept a non existing bill is not binding; but see Le Blanc's opinion, which limits it and makes it binding under circumstances; and see remarks on that case in [Coolidge v. Payson] 2 Wheat. [15 U. S.] 73. The true principle is the credit given to the promise, this cannot be weaker if the party making the promise has funds. Was there an express promise? The words are, "for which you can value on us." Nothing is said expressly about accepting or honouring the bill; none of the cases contain an express promise in terms to accept. Pierson v. Dunlop. Cowp. 572. That was a negative acceptance. that is. it will not be accepted till the navy bill was paid; "you can value," that is, we authorize you to do it, to draw a good and valuable bill. See Chit. Bills, 215, 227. as to what is an acceptance.

2. Was the attorney authorized to draw the bill at the time he drew it. that is, did the bankruptcy of Thomas Newbold revoke the authority? Ward acted as the attorney of Newbold to the 17th of March, 1828. He dealt with the plaintiffs in that character; made them advances in that character; he had said or reported in New York. that Newbold (then in England) was bankrupt, but he had no official knowledge of it until the 17th of March. Does a bankruptcy in England revoke a power of attorney in the United States, so far as relates to property in the United States. paying debts. &c. without notice? It does not, that is, so as to prevent the attorney from paying debts. The revocation by bankruptcy is by the operation of law, not by the act of the principal. The English bankrupt law has no extra-territorial power. it operates no transfer of property in the United States, to the prejudice of American creditors. Creditors have attached property here after bankruptcy there. Harrison v. Sterry, 5 Cranch [9 U. S.] 302; Milne v.

Moreton, 6 Bin. 353, 360. Can a foreign attaching creditor take the property, notwithstanding the bankruptcy, and yet a creditor here cannot receive it from the attorney with whom he dealt, to whom he made his advances on the credit of the funds in his hands, and that they would be at his disposal? If the power of attorney is revoked by the bankruptcy in England, it must be by transferring the property in the hands of the attorney to the assignees under the commission; the transfer then should also reach the attachments, which can hold the property only as the bankrupt's at the time of the attachment. The objection must be, not that the assignment in England directly affected or revoked the power, but that the property in question no longer belonged to the principal or to his attorney; that he has no power over it, because it was transferred to the assignees. Did it transfer the property? Could not the bankrupt himself have paid debts with this money? Bankruptcy, assignment, &c. are all nothing, as to the acts of the attorney, without notice. Wickersham v. Nicholson, 14 Serg. & R. 118. This case proceeded on a misapprehension of the English law, as it appears in Vernon, which was overruled in Sowerby v. Brooks, 4 Barn. & Ald. 523. Issuing a commission is not of itself notice of an act of bankruptcy. There is but one instance of constructive notice in the English bankrupt law, that is, a publication in the Gazette, with ground to believe that the party had read it; as to death, partnership and revocation by the principal, notice is necessary. Gow, Partn. 53, 54; Paley, Ag. 142, 157; Salte v. Field, 5 Durn. & E. [5 Term R.] 211; —— v. Harrison, 12 Mod. 346; 2 Ves. Jr. 118; Eden, Bankr. 261. What was the notice in this case? The new attorney of the assignees presented himself and his power to the agent here, on the 17th of March. This, the only notice, except a rumour he had heard before. No party bound to respect it, would the agent have been justified if by relying on it, his principal had lost a debt? It was uncertain in its terms. To say that a man is bankrupt does not necessarily mean that it is a bankruptcy, in due course, so as to affect the authority of an agent, or the property in his hands. The statute does not make this notice, it must be knowledge. 16 Vin. 10, pl. 2; 14 Serg. & R. 143. If the principal had sent a revocation to his agent, which was concealed from persons dealing with him as the agent, it would not affect them. A foreign bankruptcy cannot have more effect than an absolute revocation of the power. Morgan v. Stell, 5 Bin. 315.

Mr. Broom, for defendant.

The case in 2 Wheaton [supra] puts at rest many of the doubts on this subject in England. There must be a promise to accept. When I say, you may draw on me for a certain amount, it is an undertaking to accept and pay it? but is such a promise negotiable?

can it be transferred to another? Can the person who takes such a draft sue in his own name? Did the letter intend that Newbold should draw in favour of any body, or only that there was that balance to be paid to him if he called for it?

2. As to the effect of the bankruptcy. We do not contend that a bankruptcy in England operates as a legal transfer of property here, but the assignees may sue in the name of the bankrupt for their own use. 6 Bin. 361. See argument of Mr. Binney in that case. Can the power of attorney subsist after all the authority of the principal is gone? He could not have made a contract in relation to this property. How could his attorney? It follows that provided there was notice, the transfer would be void as between the principal and agent. The whole power of the agent over this property was gone by the bankruptcy, the only question, as to third persons not having notice. Houston v. Robertson, 6 Taunt. 449; 16 East, 386; 5 Esp. 158. How far will the want of notice protect third persons? We do not contend that general rumour is notice. This rumour was sufficient to put the attorney on the inquiry. Why protect the plaintiffs more than any other creditors of Newbold? If the draft is destroyed they will stand as they did before it was drawn; they are not injured, or their position changed.

Mr. Binney, in reply.

The law, as established by the supreme court, is, that if an engagement authorizes another to draw, it is negotiable. 16 Vin. 5, pl. 12. The letter is not a promise to pay, but an authority to draw a bill—to make a negotiable instrument. When the question is between the bankrupt and his foreign assignees, the court will assist the latter. The case is different when it is between the foreign assignees and creditors here. The English system of bankruptcy has no effect here by its own force; it is by courtesy, in a case between the bankrupt and his assignees. The injury to the party is not the question, but whether these acts are revocations to persons not having notice of them. [Coolidge v. Payson] 2 Wheat. [15 U. S.] 73.

Mr. Broom cites 4 Camp. 272, as to revocation of power.

HOPKINSON, District Judge. On the 6th of July, 1826, Thomas Newbold, then of the city of New York, but about to depart for England, appointed Oliver D. Ward and George H. Newbold, jointly and severally his attorneys, for him and in his name, or in the name of Thomas Newbold & Co.; authorizing them or either of them, among other things, "to draw such bill or bills of exchange, check or checks, note or notes, and accept, indorse and pay the same, and execute and deliver such instrument or instruments in writing, as they shall consider necessary in

the due course and management of his business." Shortly after the execution of this power, Thomas Newbold left the United States, and Oliver D. Ward took upon himself the powers given him by that instrument. He transacted all the business of Newbold in this country, opened and answered his letters, drew drafts and bills in his name and in his behalf, and generally did his business. In the exercise of this trust and authority, Mr. Ward had put into the hands of the defendants, then residing in Philadelphia, a certain quantity of tin, on Newbold's account, and instructed them to sell it. On the 13th of March, 1828 the defendants addressed a letter to Thomas Newbold & Co., New York, in which they write: "Gentlemen: Herewith you have sales of three hundred boxes tin, which we hope will be satisfactory, net amount 2,569 dollars 72 cents, which you can value on us for, payable on the 19th instant, say twenty-five hundred and sixty-nine dollars and seventy-two cents. Yours, very respectfully, Gillingham, Mitchell & Co." This letter, of course, was received by the agent, Oliver D. Ward, and opened by him. He was known by the defendants to have this authority, as several letters had passed between them on the subject of this tin. At the time Mr. Ward received the above letter, Thomas Newbold was indebted to the plaintiffs, Ogden, Ferguson & Co., and continued so after this suit was brought. Mr. Ward had some money in his hands to pay them on account of their advances to Newbold. After receiving the letter he went to them, showed them the defendants' letter, and offered to give them a draft on the defendants for the amount stated in the letter, which they agreed to receive as cash. There was more than this amount due them by Thomas Newbold. On the 15th of the same March, that is, two days after the date of the defendants' letter, Ward drew a draft on the defendants, for the recovery of which the present action was brought. The draft is as follows: "$2,569.72. New York, March 15, 1828. On the 19th instant, without grace, please to pay to the order of Messrs. Ogden, Ferguson & Co., twenty-five hundred and sixty-nine dollars and seventy-two cents, value received, and charge the same to your obedient servants, Thomas Newbold & Co., per O. D. Ward. To Messrs Gillingham, Mitchell & Co., Philadelphia." It will be observed that this bill is drawn precisely in conformity with the letter of the defendants in every essential particular. It is for the same amount; it is payable on the 19th instant, without the usual grace; it is unquestionable that the letter describes the bill which may be drawn, and the bill actually drawn is according to that description. At the time of these transactions in Philadelphia and New York, as it afterwards appeared, Thomas Newbold had become a bankrupt in England. There was a report of this in New York before the draft was drawn; but

Mr. Ward, the agent, was not officially informed of it until the 17th of March, when the attorney under the assignees superseded Mr. Ward in his agency. When this bill was presented to the defendants, which was on the 17th of March, they replied that it could not be paid for want of authority, and it was accordingly protested. This action is brought against the defendants on their acceptance of the bill, according to the usage and custom of merchants, and the question is, are the plaintiffs entitled to recover in this action?

The prominent facts of the case are: (1) A clear authority given by the defendants to draw the bill upon them, which is sufficiently described, and was afterwards drawn in conformity with the authority and description; and a promise or undertaking, that if such a bill were drawn, it would be accepted. It is true they do not say in the terms, if you draw such a bill, we will accept it; but they use a mercantile phrase. perfectly well and universally understood to mean the same thing, that is, "which you can value on us for," or which you can draw on us for; and to say that Newbold may draw, is to promise that they will accept: otherwise a paltry equivocation would be allowed to defeat a clear engagement, and to destroy all commercial faith and confidence. (2) When the defendants gave this authority to draw, and this promise to accept, they had in their hands, and still have, funds of the drawer, more than sufficient to answer the bill. (3) The bill was drawn after the promise was made, and promptly after it was received. There was no unreasonable delay in drawing, which by any possibility could have prejudiced the defendants. (4) The bill was drawn in consequence of the promise contained in the letter of the 13th of March, 1828. That letter was shown to the payees of the bill, as the authority of the drawer; and the bill was taken by the plaintiffs as so much cash, on the faith and credit of that letter. (5) The bill was taken for an antecedent debt, and not for money advanced particularly upon it.

On these facts, a verdict was taken for the plaintiffs, for 2,822 dollars 82 cents. subject to the opinion of the court, on the following points: (1) Whether there was an acceptance of the bill. (2) Whether the bankruptcy of Thomas Newbold took away the authority of his agent to draw the bill.

On the first point, it is not necessary to consult the English cases for information or authority (although I think them very clear), when the law of the subject has been examined and settled by the supreme court of our country. In the case of Coolidge v. Payson, as reported in 2 Wheat. [15 U. S.] 66, the English decisions are examined by the chief justice, who delivered the opinion of the court, beginning with Pillans v. Van Mierop, 3 Burrows, 1663; and it is considered by the chief justice that there is no essential difference between that case and the one be-

fore the supreme court. The chief justice distinctly states the question in Coolidge v. Payson [supra] to be, "does a promise to accept a bill, amount to an acceptance, to a person who has taken it on the credit of that promise, although the promise was made before the existence of the bill, and although it is drawn in favour of a person who takes it for a pre-existing debt." I am at a loss to conceive how the question in the case before this court, can be stated in more precise and comprehensive terms, in all its essential points. On my construction of the letter, the promise to accept was made, the bill was taken on the credit of the promise; the promise was made before the existence of the bill, and it was drawn in favour of a mere person who took it for a pre-existing debt. The answer, therefore, which the supreme court gave to this question, in the case of Coolidge v. Payson, must be the answer of this court in this case. That answer is thus given: "It is of much importance to merchants that this question should be at rest. Upon a review of the cases which are reported, this court is of opinion, that a letter written within a reasonable time before or after the date of a bill of exchange, describing it in terms not to be mistaken, and promising to accept it, is, if shown to the person who afterwards takes the bill on the credit of the letter, a virtual acceptance binding the person who makes the promise." The judgment of the court below was affirmed. On the first point, therefore, I am of opinion that there was a full and binding acceptance by the defendants, of the bill on which this suit is brought.

2. Did the bankruptcy of Thomas Newbold take away the authority of his agent, O. Ward, to draw this bill; for if he had no authority to draw the bill, it cannot affect the funds of Thomas Newbold, on which it was drawn; and the letter of the defendants gave a right only to Thomas Newbold & Co., or one possessing their authority, to draw. The power of attorney given in July, 1826, by Newbold to Ward, was full and explicit for this purpose, and unless afterwards revoked or annulled, it continued when this bill was drawn. The agency of Ward was well known to the plaintiffs; they had dealt with him in that capacity. The bankruptcy of Thomas Newbold, in England, prior to the drawing of this bill in New York, is the only circumstance relied on to support the position that the powers of Mr. Ward, as the agent of Newbold, were determined and annulled at the time he drew the bill for Thomas Newbold & Co. Was such the legal operation and effect of the bankruptcy under the circumstances of this case? In the first place, had Ward, when he drew the bill, or the plaintiffs, when they took it in payment as cash, notice of the bankruptcy? We have no evidence on this point but from Mr. Ward himself, on his cross-examination; nor have the defendants attempted to strengthen what

he has said, or to enlarge it, by other testimony in the city of New York or elsewhere. Mr. Ward says, "that he had heard it reported in New York that Thomas Newbold was a bankrupt before he gave the aforesaid draft; but was not officially informed of it until Monday, the 17th of March, 1828, about 11 o'clock, a. m., when Mr. Smith, the attorney for the assignees under the commission of bankruptcy, superseded him in his agency aforesaid." Can Mr. Ward be considered to have any notice of the bankruptcy which he was bound to regard, or would have been justified in regarding, until the 17th of March? He did not consider himself to be superseded in his agency till that time. If he had ceased to act on the mere report of the bankruptcy, and it had afterwards turned out to be unfounded, as many reports in a great commercial city daily prove to be, and his principal had suffered in his property or credit by such precipitancy, it would hardly have protected Mr. Ward from a responsibility for the damages sustained, if he had merely proved the existence of a vague report, vouched by no body, and without any known name or authority. Weak, however, as this report was, as a foundation for belief and adoption as a rule of action, it does not appear that it had reached the ears of the plaintiffs, who had acted in entire good faith in taking this bill.

On this view of this part of the case, we must consider the effect of the bankruptcy upon the power of attorney and the acts of the agent, as if those acts were done without any knowledge or notice of the bankruptcy. If it were desirable or proper to discuss in this place abstract questions, not necessary to the decision of the case in hand, such speculations might be indulged on this occasion. How does the bankruptcy of the principal affect his power of attorney, and the authority of the agent under it? Is it by a direct and immediate operation upon the instrument or letter of attorney; or only indirect and consequential, by divesting both the bankrupt principal and his agent of all property on which the power can act? This question would be tested, by supposing a species of property (and Judge Washington thought there might be such) which does not pass by the assignment of the commissioners. Would the power of the agent over such property be revoked and determined by the bankruptcy; or, in the present case, was the drawing of the bill an unauthorized and void act; a nullity not only in relation to the fund on which it was drawn, but to every intent and purpose to which the bill might be applied? Could the holder prove it as a debt under the commission, or if its date, being subsequent to the bankruptcy, would exclude it, would the bankrupt be liable for it as not being within his certificate and discharge? The principal himself has done nothing to revoke the power; and if it be annulled, it must be so by the legal operation

of the assignment to the commissioners; but that assignment contains no terms to transfer anything but the property, effects and credits of the bankrupt. If the whole operation of the bankruptcy and the assignment is on the property of the bankrupt, and it can reach the agency only by and through the property; it is the unquestionable law of this court, derived both from the supreme court of the United States, and the supreme court of this state, that the bankrupt law of a foreign country is incapable of operating as a legal transfer of property in the United States; that an assignment by law has no legal operation out of the territory of the law maker; and, in the case decided in Pennsylvania, an American creditor attaching in the United States, the property of a bankrupt debtor, who had become bankrupt in England, before the attachment was issued and laid, was preferred to the assignees of the commissioners. On what principle can we say that a debt actually paid in this country by the bankrupt, or, his authorized agent, or which is the same thing, that an appropriation by the agent and the acceptance by the creditor of the bankrupt in the United States, of certain funds of the bankrupt, also in the United States, shall be defeated by the assignment under the commission in England? Why is such a creditor, to whom it may be said the funds have been paid and delivered, at least against the bankrupt and all claiming by and under him, by the delivery and acceptance of the bill, to be in a worse situation than a creditor who has laid his attachment on the same property or funds, which is liable to litigation and dispute in various ways?

The cases cited by the defendants' counsel to show the effect of a bankruptcy upon an agency in England; all the parties residing there; all subject to the law there, and all having notice of the bankruptcy, have no application to a case like the present; nor does the modus operandi by which the agency is destroyed in England by a bankruptcy, appear in any of these cases. The case here is this; the agent held in his possession a full and unquestioned power of attorney, and had acted under it for two years antecedent to this transaction; he was known and recognised and dealt with as the agent of Thomas Newbold, both by the acceptor of the bill and the person in whose favour it was drawn, and to whom it was delivered as so much cash, in payment of a bona fide debt due to him from the principal. The agent who drew the bill, and the payee, were both resident in the city of New York, where the bill was drawn, and the defendants, on whom it was drawn, resided in the city of Philadelphia, having in their hands the funds belonging to the principal on which the draft was made. At the time the bill was drawn by the agent and delivered to the plaintiffs, neither of them had any notice of the bankruptcy of the principal, which took place in England. In such a case, I am clear that the bankruptcy has no effect upon the acts of the agent, whatever its general operation on the agency may be. The fund in the hands of the defendants, to the amount of their acceptance, was appropriated to the use of the plaintiffs, and they are entitled to recover that amount in this action. Let judgment on the verdict be entered for the plaintiffs.